Jacob A. **HOOVER**, et al., **Plaintiffs,**

v.

**RECREATION EQUIPMENT CORP.,** et al., **Defendants.**

No. 89–CV–1896.

United States District Court, N.D. Ohio, E.D.

March 8, 1991.

1486

Eugene G. Godward, Lawrence Comanor, Comanor & Godward, Cuyahoga Falls, Ohio, for plaintiffs.

Mark S. Yacano, Phillip J. Campanella, Calfee, Halter & Griswold, Cleveland, Ohio, for Recreation Equipment Corp., Donald C. Wright, Joan S. Wright, Charles T. Norton, Jr., Marylee Norton and Industrial Metal Craft, Inc.

Pamela Nagle Hultin, Thompson, Hine & Flory, Cleveland, Ohio, Kevin J. Breen, Thompson, Hine & Flory, Akron, Ohio, for Ultra Play Systems, Inc.

## ORDER

SAM H. BELL, District Judge.

## I. STATEMENT OF THE CASE

The plaintiffs in this products liability cause of action are Jacob A. Hoover, a minor, and his mother and duly appointed guardian Susan L. Hinton. The defendants are: (1) Recreation Equipment Corporation (REC) an Indiana corporation; (2) Ultra Play Systems (Ultra Play), an Indiana corporation; (3) Industrial Metal Craft Corporation (Industrial); (4) Donald C. Wright; and (5) Charles T. Norton.

The court has jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332, diversity of citizenship. Currently before the court are four motions for summary judgment. Two of those motions were filed by Ultra Play and are the subject of this order. With regard to the third and fourth motions, they are motions to dismiss

or in the alternative motions for summary judgment filed by (1) Industrial and REC; and (2) Donald Wright and Charles Norton individually. The court will stay ruling on the third and fourth motions pending the imminent completion of certain discovery.

## II. STATEMENT OF FACTS

Many of the facts in this case pertain specifically to the different issues which have been raised and which will be examined in some detail. Accordingly, the court will give only a brief, general account of the facts at this point in the opinion.

On April 5, 1988, five-year old Jacob Hoover sustained severe injuries when he fell from a sliding board (slide) at the Fort Island Primary School (the school). This accident gave rise to plaintiffs' present claim for damages based on negligence and strict liability.

In 1960 REC manufactured and sold the subject slide to the school. The slide was apparently set in concrete footings on an asphalt playground surface at the school site.

Ultra Play was incorporated in accordance under the laws of Indiana on October 9, 1986, with its principal place of business being located in Anderson, Indiana. In October of 1986, Ultra Play entered into an asset purchase agreement (APA) with REC.

## III. SUMMARY JUDGMENT STANDARD

In reviewing a motion for summary judgment, a court must consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979). Rule 56 provides, in relevant part, as follows:

(c) ...

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . . .

(e) ...

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Three Supreme Court cases have provided guidance as to the nature of the respective burdens allocated under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The ultimate burden lies with the non-moving party to show the existence of a genuine issue of material fact. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Fed.Rule Civ.Proc. 56(e)." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis supplied). "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The court in *Anderson* held that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as

the plaintiff had had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514.

On the other hand, the moving party's burden under Rule 56 is lighter.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c) ... suggests the absence of such a requirement.

*Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis supplied).

The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford and Co.*, 886 F.2d 1472 (6th Cir.1989) recently reviewed court decisions and commentary regarding the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that a "new era" in summary judgment practice has opened in the court system as a result of these opinions.

Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases ... On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact and tended to emasculate summary judgment as an effective procedural device.

*Street, supra* at 1476.

The court enunciated the following "new era" principles, among others: as on federal directed verdict motions, the "scintilla" rule applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion; the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"; the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id.* at 1479–1480 (footnotes and citations omitted).

## IV. ULTRA PLAY'S FIRST MOTION FOR SUMMARY JUDGMENT

### A. Personal Jurisdiction

In a diversity suit, *in personam* jurisdiction is determined by the law of the forum state. *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1167 (6th Cir.1988); *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir.1972). This court's jurisdiction over the defendant is predicated upon an application of the Ohio Long Arm Statute, Ohio Revised Code § 2307.382. This statute has been construed to be compatible with the due process requirements of the fourteenth amendment to the United States Constitution. *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1167 (6th Cir.1988); *Didactics Corp. v. Welsh Scientific Co.*, 291 F.Supp. 890 (N.D.Ohio 1968). Thus the issue before this court is whether the state's jurisdiction may be extended to reach the defendant, consistent with the permissible limits of due process protection under the fourteenth amendment.

■ It is the plaintiff who must assume the burden of establishing by a preponderance of the evidence that this court has personal jurisdiction over the defendant. This burden is met by showing that due process has been satisfied, *i.e.*, by a showing of some minimum contacts between the defendant and the forum state, such that maintenance of a suit does not offend traditional notions of fair play and justice. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, (1958); *International Shoe Co. v. State*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■ A distinction is made between "general" jurisdiction and "specific" jurisdiction when analyzing the due-process limits of personal jurisdiction. *Third Nat. Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1089 (6th Cir.1989). With regard to general jurisdiction, a state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state, so long as defendant's contacts with the forum state are "continuous and systematic." *Id. See also Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). With regard to specific jurisdiction, "a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984); *Third Nat. Bank in Nashville*, 882 F.2d at 1089.

At this juncture in the analysis a determination cannot be made as to whether or not this court has specific jurisdiction over Ultra Play. It is suggested, however, that subsequent analysis of various other questions involved in the motions filed herein do not warrant a conclusion that this court does not have specific jurisdiction. However, this court is of the opinion that it has general jurisdiction over Ultra Play.

■ In its answers to interrogatories, Ultra Play has stated that: (1) it has shipped goods into the state of Ohio from 1986 to present; (2) from October through December of 1986 Ultra Play sold $988 worth of playground slides, similar to the slide in question, to customers in the state of Ohio; $6,188 in 1987; $8,353 in 1988; and $5,735 in 1989; (3) Ultra Play also has sold other types of playground equipment, athletic equipment, and pool equipment in the state of Ohio from 1986 to the present; and (4) Ultra Play circulated advertisement, catalogues, and other promotional material to addresses within the State of Ohio from 1986 through present. *See* Ultra play Responses to First Set of Interrogatories at 11–14.

Notwithstanding Ultra Play's contention that it has no employees, office, or agent located in the State of Ohio, this court finds that for the reasons stated above, Ultra Plays's contacts with Ohio are of such a "continuous and systematic" nature that the exercise of general jurisdiction over Ultra Play would not offend traditional notions of fair play and justice.

## B. Choice of Law Regarding Issues of Products Liability

■ It is axiomatic that a federal court sitting in diversity must apply the conflict of law rules of the state in which it sits. *See Klaxon v. Stentor*, 313 U.S. 487, 490, 61 S.Ct. 1020, 1020, 85 L.Ed. 1477 (1941); *Colonial Refrigerated Transportation, Inc. v. Worsham,* 705 F.2d 821, 825 (6th Cir.1983); *Detrex Chemical Industries, Inc. v. Employers Insurance of Wausau,* 681 F.Supp. 438, 455 (N.D.Ohio 1987). Therefore, this court must apply Ohio conflict of law principles to determine whether Ohio or Indiana substantive law will govern the product liability issues in this case.

Ohio law prior to 1971 dictated that the substantive law of the place of injury controlled tort action under the rule of *lex loci delicti.* In 1971, however, the Ohio Supreme Court began to depart from this somewhat mechanical approach in favor of balancing the state interests involved. *Fox v. Morrison Motor Freight, Inc.*, 25 Ohio St.2d 193, 197–200, 54 O.O.2d 301, 267 N.E.2d 405 (1971). In subsequent decisions, the Ohio Supreme Court has continued to move toward an analytical method with increased emphasis on a case-by-case approach. *Moats v. Metropolitan Bank of Lima,* 40 Ohio St.2d 47, 49, 69 O.O.2d 323, 319 N.E.2d 603 (1974); *Schiltz v. Meyer,* 29 Ohio St.2d 169, 171–72, 58 O.O.2d 391, 280 N.E.2d 925 (1972).

In *Morgan v. Biro Manufacturing Co.,* 15 Ohio St.3d 339, 15 OBR 463, 474 N.E.2d 286 (1984), the Ohio Supreme Court reviewed and clarified its approach to conflict of law question. The *Morgan* court adopted the methodology stated in the Restatement of the Law of Conflicts as a guideline and announced:

When confronted with a choice-of-law issue in a tort action under the Restatement of the Law of Conflicts view, analysis must begin with Section 146. Pursuant to this section, a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 which the court may deem relevant to the litigation. All of these factors are to be evaluated according to their relative importance to the case.

*Id.* at 342, 15 OBR 463, 474 N.E.2d 286 (footnotes omitted).

Section 6 of 1 Restatement of the Law 2d, Conflicts of Laws 10, provides as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of law to be applied.

Section 6 of 1 Restatement of Law 2d, Conflicts of Laws 10.

■ Analysis in this case thus begins with the presumption that the law of Ohio, the place of the injury, controls. The next step is to determine whether Indiana has a more significant relationship to the lawsuit, with regard to the product liability issues, using the factors contained in Section 145.

Upon application of the facts of this case to the choice of law test set out in Section 145, this court is of the opinion that on balance, Indiana does not have a more significant relationship to this lawsuit than Ohio, with regard to the product liability issues. Accordingly, the substantive law of the state of Ohio governs the products liability aspects of this action.

## C. Choice of Law Regarding Issue of Successor Liability

In Ultra Play's motion for summary judgment and in plaintiffs' response, both sides rely heavily on the Ohio Supreme Court case of *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331 (1987) in support of their respective positions on the issue of successor liability. After a thorough review of those briefs this court raised the question of whether perhaps Indiana law might not govern this issue.

Thus it was that this court heard oral arguments and has again considered the parties' views on the issue of whether to apply Ohio substantive law to the product liability issues and the successor liability issue, or whether to invoke the conflicts doctrine of depecage [1] and apply Ohio substantive law to the product liability issues and Indiana substantive law to the issue of successor liability. Upon review of the relevant case law in this area, the court is of the opinion that Ohio substantive law should govern both the product liability issues and the issue of successor liability.

■ Applying the substantive law of two different states to two separate issues is not necessarily undesirable. *See In re*

---

**1.** *See* Reece, *Depecage: A Common Phenomenon in Choice of Law,* 73 Colum.L.Rev. 58 (1973).

*Air Crash Disaster Near New Orleans, Louisiana,* 821 F.2d 1147, 1169–1170 fn. 38 (5th Cir.1987) (*en banc*) (court applied doctrine of depecage to split substantive issues of law between Louisiana and Uruguay); *Ewing v. St. Louis–Clayton Orthopedic Group, Inc.,* 790 F.2d 682, 686–87 (8th Cir. 1986) (the doctrine of depecage, *i.e.,* applying the law of different states to different issues in the same case, "is perfectly permissible and even considered desirable in many instances") (footnote omitted); *Foster v. United States,* 768 F.2d 1278, 1281 (11th Cir.1985) (doctrine of depecage applied); *International Administrators, Inc. v. Life Insurance Company of North America,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985) ("[t]he choice of law is not made once for all issues; the trend is to decide the applicable law for each issue separately") (citations omitted). While this court recognizes that the doctrine of depecage may be desirable in certain instances, the court declines to apply the doctrine to this case for the following reasons.

First, as the parties have indicated, this court must look to the choice of law factors announced in *Morgan v. Biro Manufacturing Co.,* 15 Ohio St.3d 339, 15 OBR 463, 474 N.E.2d 286 (1984) to determine whether Ohio or Indiana substantive law will govern the successor liability issue.[2] In accordance with *Morgan* the analysis of this conflicts issue begins with the presumption that the law of Ohio, the place of the injury, controls. The next step is to determine whether Indiana has a more significant relationship to the lawsuit, with regard to the successor liability issue, using the factors announced in Section 145. It is the opinion of this court that when the facts of this case are applied to the choice of law factors announced in Section 145, on

balance those factors support the viewpoint that Ohio substantive law should govern the issue of successor liability. With regard to the relevant policy considerations announced in Section 6, it is the opinion of this court that while Indiana has an interest in seeing that its law governs asset purchase agreements entered into between two Indiana corporations, Ohio has a greater interest in seeing that Ohio law applies to its own citizens who may be *affected* by the legal implications of those agreements. Accordingly, it is the opinion of this court that Ohio substantive law will govern the issue of successor liability.

Second, the court's finding, in this regard, is bolstered by the fact that the Ohio Supreme Court[3], as well as courts from other jurisdictions[4], also applied the substantive law of the forum to the issue of successor liability when faced with facts similar to those before this court. The Ohio Supreme Court's decision in *Flaugher* involved an Ohio plaintiff and Vermont and Delaware corporations that had entered into an asset purchase agreement in Vermont. Although the *Flaugher* court did not engage in a conflict analysis, the court applied Ohio law to determine whether or not there was successor liability. Thus, when faced with the same conflicts issue as that which we face in the present case, the Ohio Supreme Court applied the law of the forum state. The findings of the *Flaugher* court, in this regard, have a precedential impact upon this court.

The reasoning announced by the Seventh Circuit in *Travis v. Harris Corp.,* 565 F.2d 443 (7th Cir.1977), lends additional support to this court's determination that Ohio law will govern the issue of successor liability. The Seventh Circuit was faced with a situation very similar to the present case, involv-

---

**2.** For a discussion of the choice of law factors announced in *Morgan* see *supra* pages 1489–1490. *See also Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136, 142 (E.D.Mich.1979) (issue of successor liability should be characterized as a tort issue rather than a contract issue for purposes of conflicts analysis).

**3.** *See Flaugher v. Cone Automatic Machine Co.,* 30 Ohio St.3d 60, 30 OBR 165, 507 N.E.2d 331 (1987).

**4.** *See Travis v. Harris Corp.,* 565 F.2d 443 (7th Cir.1977) (for a discussion of the *Travis* case see *infra* page 1491–92); *Korzetz v. Amsted Industries, Inc.,* 472 F.Supp. 136 (E.D.Mich.1979) (case involving Michigan plaintiff and asset purchase agreement entered into between corporations located outside Michigan, court applied substantive law of forum to issue of successor liability); *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976) (same).

ing, as a matter of fact, Indiana and Ohio law. In that case, however, the plaintiff was a resident of Indiana and the predecessor and successor corporations were Ohio corporations. The agreement governing the assets sale between those corporations, provided that Ohio law should apply. The court determined that: "[t]hough the contract may be interpreted under Ohio law, the legal effect of that agreement, and questions of traditional tort law unrelated to the contract, are to be determined in accord with the laws of Indiana, the situs of the injury and domicile of Travis." *Id.* at 446.

The case *sub judice* is the mirror image of *Travis* with regard to this conflicts issue. In this case we are dealing with Indiana corporations and Ohio plaintiffs. Persuaded by the logic of the *Travis* decision, this court finds that while the APA may be interpreted under Indiana law, the legal *effect* of the APA is to be determined by Ohio law.

Therefore, in accordance with the choice of law factors announced in *Morgan*, the precedential findings in *Flaugher*, and the reasoning announced in *Travis*, this court will proceed to analyze the issue of successor liability pursuant to Ohio law.

### D. Successor Liability

#### 1. Generally

Central to the issue of successor liability is *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St. 3d 60, 30 OBR 165, 507 N.E.2d 331 (1987). Justice Douglas speaking for the *Flaugher* court, enunciated the rule of successor liability as follows:

The general rule in products liability is that a successor corporation's amenability to suit will depend on the nature of the transaction which gave rise to the change in ownership. Where the transfer is accomplished by means of a statutory merger or consolidation, the liability of the former corporation will be assumed by the new entity. Where there is merely a sale of a corporation's assets, the buyer corporation is not liable for the seller corporation's tortious conduct un-

less one of the following four exceptions applies:

(1) the buyer expressly or impliedly agrees to assume such liability;

(2) the transaction amounts to a *de facto* consolidation or merger;

(3) the buyer corporation is merely a continuation of the seller corporation; or

(4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Flaugher*, at 62, 30 OBR 165, 507 N.E.2d 331 (citations omitted).

The transaction that occurred between REC and Ultra Play involved only a sale of corporate assets. Accordingly, Ultra Play is not liable unless one of the above four exceptions is applicable. Plaintiffs argue that exceptions one and three are applicable in this case. Therefore, the court will proceed to analyze those two exceptions.

#### 2. Whether Ultra Play Assumed Liability

Article II section 2.3 of the APA states:

· 2.3 *Assumption of Liabilities.* Except with respect to the liabilities of Seller set forth on *Schedule 5* which shall be updated as of the Closing Date, Buyer shall not assume, and Seller shall be responsible for, any liabilities (whether existing or contingent on future events) of Seller directly or indirectly arising out of or relating to any transaction entered into or any set of facts, events, occurrences or acts existing on or prior to the Closing Date (including, but not limited to, any express or implied warranty prior to the closing date). However, it is understood that apart from transferring to Buyer any claim Seller may have against a supplier with respect to goods and materials furnished and incorporated in any Inventory sold herewith, Seller shall have no responsibility to Buyer with respect to the Inventory. Notwithstanding that Buyer may suffer a warranty claim on its resale to another or that Buyer may become responsible for same in respect of Inventory supplied to Seller to permit it to fill pending orders. Buyer

shall assume only such liabilities as are set forth on such *Schedule 5*.

APA at 5–6 (emphasis in original).

The plain language of section 2.3 clearly indicates that Ultra Play did not expressly assume liability. However, plaintiffs contend that for a number of reasons, Ultra Play may have assumed REC's liabilities by implication.

First, plaintiffs make the point that there is a certain degree of inherent ambiguity in Section 2.3 inasmuch as Schedule 5, which presumes to set forth the liabilities which Ultra Play is to assume, is claimed by Ultra Play not to be a part of the APA. *See* Plaintiffs' Exhibit F. Defendants answer is that it was REC's obligation under the terms of the agreement to deliver all the schedules at closing. Since REC failed to provide section 5 it did not become part of the Agreement.

Inasmuch as there is no evidence to indicate that section 5 ever existed or that it was made part of the APA, this court cannot determine this question either way and certainly will not infer any wrongdoing on the part of Ultra Play or Ultra Play's counsel which might have led to the 'failure' to include schedule 5.

■ Second, plaintiffs contend that section 2.3 is aimed primarily at warranty claims relating to REC's products and not product liability claims. Defendants respond by stating that plaintiffs' contention ignores the plain language of section 2.3 which provides that: "[Ultra Play] shall not assume ... any liabilities of [REC] ... relating to any transaction ... or any set of facts, events, occurrences, or acts ... (including, but not limited to, any express or implied warranty prior to the closing date)."

The court finds defendant's position well taken. Section 2.3 does not appear to be limited to warranty claims; it does appear by its language to encompass product liability claims as well.

■ Third, plaintiffs aver that Section 2.3's general language is governed by the more specific indemnity provisions, term notes and escrow agreements. Specifical-

ly, plaintiffs assert that Article XI of the APA provides that for the first two fiscal years after closing, REC has an absolute obligation in regard to product liability claims asserted against Ultra Play regarding products sold by REC prior to closing. It is contended that if a claim were asserted against Ultra Play in the third fiscal year after closing regarding products that REC sold prior to closing, then REC shall indemnify Ultra Play against any loss.

Plaintiffs proceed by citing to a paragraph at the end of the promissory notes, which reads:

If at the maturity of this Note there are pending any claims which are the Holder's (Recreation's) responsibility under a certain Asset Purchase Agreement of even date and which have been asserted against Holder during the period of three (3) years from date, Maker (Ultra Play) shall pay into the escrow agreement established with American Fletcher National Bank and Trust Company one-half of that amount which represents a reasonable reserve for costs of defense and settlement. Absent circumstances to the contrary, the amount incurred per claim during the preceding three (3) years shall presumptively be a reasonable amount to reserve for each claim. The balance of the principal and accrued interest shall be paid to Holder.

Plaintiffs contend that this paragraph means that if a claim were to arise from a product sold by REC prior to closing the APA, and that claim is still pending when the promissory notes mature, *i.e.*, October 15, 1989, then Ultra Play and REC would evenly divide liability. On the basis of this provision, plaintiffs assert, Ultra Play has assumed liability and the first exception to the general rule that purchasers of assets are not liable for a seller's liabilities, applies.

This court cannot agree with plaintiffs' interpretation of the above passage. The court's interpretation of this passage is that if on October 15, 1989 there are claims pending against REC, and if those claims were REC's responsibility because of the terms of the agreement between REC and

Ultra Play, and those claims had been asserted against REC during the period 1986–1989, then Ultra Play must pay into an escrow account an amount equal to one-half of the amount believed to be a reasonable reserve for the costs of defense and settlement of the claim in question. Ultra Play is not assuming liability: rather Ultra Play is agreeing to share the *costs of defending* or *settling* a claim which may arise during that three-year period.

The court does not know nor need it know Ultra Play's reasons for sharing those costs. Perhaps it was a mechanism for Ultra Play's payment of the purchase price to REC, as Ultra Play asserts. However, the "why" is not important. What is important is that the various passages of the APA are not inconsistent, and that when considered in total, Ultra Play has not expressly nor impliedly assumed any liability for injuries caused by products that REC manufactured and/or sold prior to the closing date.

### 3. Whether Ultra Play is A Mere Continuation of REC

In *Flaugher*, the Ohio Supreme Court recognized two different approaches which courts have taken when analyzing the "mere continuation" exception: the traditional approach and the expanded approach. *Flaugher* at 64–65, 30 OBR 165, 507 N.E.2d 331. The traditional approach derives from corporate law and emphasizes the continuation of the corporate *entity* rather than the continuation of the *business operation*. *Id.* at 64, 30 OBR 165, 507 N.E.2d 331 (citing 1 Frumer & Friedman, Products Liability 70.58(12), Section 5.06[2][c] (1983). The traditional approach narrowly construes the "mere continuation" exception to protect corporations from unassumed liabilities. *Flaugher* at 64, 30 OBR 165, 507 N.E.2d 331.

Contrariwise, those courts which have recognized the expanded approach, a derivative from products liability law, have placed an emphasis on significant shared features between the buyer and the seller, such as the same employees, a common name, or the same management. *Id. See,* e.g., *Cyr v. B. Offen & Co.,* 501 F.2d 1145, 1153, 1154 (1st Cir.1974); *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976).

The *Flaugher* court recognized the expanded view and determined, in that case, that applying that analysis there was no continuity of operations between the predecessor and successor corporations. *Flaugher,* 30 Ohio St.3d at 65, 30 OBR 165, 507 N.E.2d 331. While the *Flaugher* court recognized the expanded approach, it is not entirely clear whether it, in fact, *adopted* that approach. The *Flaugher* court seems to apply the expanded view in an alternative manner. The factors that the court looked at when applying the expanded approach were: (1) whether the two corporations had common officers or directors; (2) whether the successor purchased all of the seller's assets or only a portion; and (3) "most importantly," whether the predecessor or seller corporation continued to exist as a viable business concern after the asset transfer. *Flaugher* at 65, 30 OBR 165, 507 N.E.2d 331.

Plaintiffs contend that the *Flaugher* court starts its analysis by stating: "[t]he general rule in *products liability* is that a successor corporation's amenability to suit will depend on the nature of the transaction which gave rise to the change in ownership." *Id.* at 62, 30 OBR 165, 507 N.E.2d 331. (emphasis added). Plaintiffs contend that the *Flaugher* court seems to analyze the successor liability issue from a products liability viewpoint which is consistent with the expanded approach. Defendants, on the other hand, contend that while the *Flaugher* court recognized the expanded approach it did not adopt that approach.

This court is of the opinion that, while the *Flaugher* court recognizes and applies the expanded view to the cause before it, its analysis under that view does not become as foundationally explicit as do similar analysis made in companion jurisdictions. For instance, in those opinions cited in *Cyr v. B. Offen & Co.,* 501 F.2d 1145 (1st Cir.1974) and *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976), the writing courts apply the expanded

products liability view, with focus being given to the economic policy considerations for doing so. Those policy considerations look to the theorem that the manufacturer is better able than the consumer, to bear the costs of injuries that result from defective products. Further, the manufacturer is in a position to insure against such risks, and it is the manufacturer alone which can improve the product's quality. These considerations were not discussed by the *Flaugher* majority.

Because the *Flaugher* court stated its awareness and apparent approval of some type of expanded approach and because it did not signify its adoption of that approach as precedential law, and because it did not detail further its aims in doing so, it is the opinion of this court that the *Flaugher* court favored an expanded view of the mere continuation exception, but limited its analysis to but three test factors, enough, the court said, to decide the issue before it. Accordingly, this court will proceed to analyze the mere continuation exception in accordance with those same three factors which it is also believed, suffice to determine a similar issue in the instant cause.

The first factor looks at whether the two corporations shared common directors or officers. Both parties to this case acknowledge that REC and Ultra Play did not share common directors or officers. Accordingly, this factor, when applied to the instant case, weighs in favor of the proposition that there was no continuity between REC and Ultra Play.

The second factor looks at whether the successor "consists solely" of the assets of the predecessor. With regard to this second factor there appears to be no genuine issue of material fact. While Ultra Play may not have acquired *all* of REC's assets, Ultra Play did acquire all of REC's manufacturing assets. Specifically, the goods, equipment and machines Ultra Play purchased from REC consisted of that which were used to design and manufacture slides and other playground equipment. Therefore, the operating assets of Ultra Play consisted solely of those assets it purchased from REC. As would be expected, Ultra Play purchased new effects, later on, as it needed. It is noted that Ultra Play continued to produce and market the slide in question. It is also noted that the majority of REC's employees went to work for Ultra Play. Accordingly, this second factor weighs in favor of the proposition that there was a continuity of operation between REC and Ultra Play.

The third factor, and the factor that the *Flaugher* court considered to be "most important" is whether the predecessor corporation continued to exist as a "viable business concern" after the asset transfer. *Flaugher*, 30 Ohio St.3d at 65, 30 OBR 165, 507 N.E.2d 331. If the predecessor continued to exist as a viable business concern after the asset sale, that fact would lend support to the proposition that the successor was not a mere continuation of the predecessor.

In the present case, Ultra Play contends that the APA was entered into on August 15, 1986, and REC "officially" dissolved, in accordance with Indiana law, in August, 1987. Plaintiffs argue that after the APA, REC was no longer a viable entity. Plaintiffs argue that REC sold all of its manufacturing assets to Ultra Play pursuant to the APA. Then, on or about December 29, 1986 REC distributed its remaining assets to its shareholders and simultaneously effectuated an I.R.C. Section 337 liquidation. In addition, plaintiffs contend that on December 29, 1986, REC transferred, by way of a Corporate Warranty Deed, all of its real estate to Donald Wright and Charles Norton, the individually named defendants in this case. The warranty deed provided that it was being filed in corporate dissolution.

Plaintiffs' account of the facts, as stated above, is not disputed by Ultra Play. In addition, in its answer to interrogatory number 17, Ultra Play itself stated that "Recreation Equipment Corp. was dissolved de facto in October 1986...." First Set of Interrogatories No. 17. Further, the Articles of Dissolution that REC filed with the Indiana Secretary of State's Office pro-

vides that the dissolution of REC was authorized on September 18, 1986.

Therefore, given the facts that are before this court, it is this court's opinion that REC did not continue to exist as a *"viable business concern"* after the APA. *See Flaugher*, 30 Ohio St. 3d at 65, 30 OBR 165, 507 N.E.2d 331. While REC did not formally dissolve until the fall of 1987, it was in the process of dissolving from August 15, 1986 to year end. Certainly, given these facts, reasonable minds can come to but one conclusion and that is that Ultra Play did not exist as a viable business concern after the APA. To say otherwise would be to elevate form over substance, giving "viability" to any shell corporation which existed in corporate form without retaining the purpose for which it was originally formed. It would simply defy common sense to conclude that REC continued to exist as a viable business concern after the APA. Therefore, this most important third factor weighs in favor of the proposition that Ultra Play was a mere continuation of REC.

In sum, while Ultra Play did not assume REC's liabilities, the undisputed evidence indicates that Ultra Play was a mere continuation of REC for purposes of successor liability. Accordingly, Ultra Play's motion for summary judgment is denied as it pertains to the issue of successor liability.

### E. Duty to Warn

■ The *Flaugher* court also addressed the issue of a successor corporation's duty to warn. The court stated:

A successor corporation may acquire a duty to warn where defects in a predecessor's products are brought to its attention. This duty may arise regardless of the nature of the transaction transferring ownership since it is based not on the corporation's successor status but on its own knowledge of the defect. *The successor corporation must be shown to have had prior knowledge, actual or constructive, of the defect in question.*
\* \* \* \* \* \*

Accordingly, we hold that a successor corporation has no duty to warn of defects in products manufactured by its predecessor unless the successor is shown to have had pre-existing knowledge, actual or constructive, of the particular defect alleged to exist. Even where such knowledge is lacking, however, the successor may still be liable for injuries resulting from its predecessor's product if any of the four exceptions to successor nonliability applies.

*Flaugher* at 67, 30 OBR 165, 507 N.E.2d 331 (citations omitted) (emphasis added).

It would seem that the view expressed in this regard means that while the successor corporation may, indeed, be liable for some misfeasance on the part of its predecessor, it, the successor, may not be held liable if liability is posited on some failure of the duty to warn and the successor has no preexisting knowledge of the causal defect.

Plaintiffs contend that Ultra Play, as an expert, knew or should have known that the product line of the slide in question was "grossly defective" because the sides were inadequate in height and were curved. It is noted that Ultra Play continued to sell this particular line of slides. In addition, plaintiffs contend that inasmuch as Ultra Play retained possession of REC's business records, Ultra Play had knowledge of previous accidents that occurred with regard to this particular type of slide.

Ultra Play contends that it had no actual or constructive knowledge of any alleged defect in the slide. Further, none of the documents in the possession of Ultra Play contain any information which could give Ultra Play actual or constructive knowledge of any purported defects in REC's products. *See* Ultra Play Reply Brief at 3. *See also* Ultra Play's Response to Interrogatory No. 9. Ultra Play notes that they invited plaintiffs' counsel to view those documents which Ultra Play had in its possession, but that plaintiffs' counsel declined to do so. Reply Brief at 3 n. 1. In addition, Ultra Play contends that there has been no judgment that has determined that this slide is in any way defective. Transcript of November 6, 1990 at 104.

Plaintiffs must present more than a scintilla of evidence that genuine issues of material fact exist as to whether or not Ultra Play had actual or constructive knowledge of the alleged defects. *See Street v. J.C. Bradford and Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). This court is of the opinion that plaintiffs have not done so here. This court cannot state, with any reasonable degree of certainty, that Ultra Play, as an expert, should have known of the alleged defects in its products absent some other evidence, such as knowledge of prior accidents. There is no evidence in the record that would indicate that Ultra Play was aware of any prior accidents regarding the type of slide in question, as it relates to the allegedly defective sides. There is evidence to indicate that several other accidents occurred on this particular type of slide, and that REC was aware of those accidents. *See* Wright Fourth Set of Interrogatories Nos. 9 & 11. However, there is no evidence to indicate that Ultra Play had actual or constructive knowledge of those accidents.

Therefore, for the reasons stated above, it is the opinion of this court that plaintiffs have not offered more than a scintilla of evidence that would establish that genuine issues of material fact exist as to whether Ultra Play had actual or constructive knowledge of the alleged defects.

Accordingly, Ultra Play's motion with regard to the issue of "independent duty to warn" is hereby granted.

### F. Statute of Repose—Ohio Revised Code § 2305.131

Ohio Revised Code § 2305.131 provides in part:

No action to recover damages ... for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, ... shall be brought against any person performing services for or furnishing the design, planning, supervision of construction, or construction of such improvement to real property, more than ten years after the performance or furnishing of such services and construction. Ohio Rev. Code § 2305.131.

The Sixth Circuit has examined O.R.C. § 2305.131 and found it to be constitutional. *See Hartford Fire Insurance Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy*, 740 F.2d 1362 (6th Cir. 1984) (*en banc*). The purpose behind § 2305.131 is to protect designers or builders of improvements to real property from extensive liability and stale litigation. *Adair v. Koppers Co., Inc.*, 741 F.2d 111, 113 (6th Cir.1984) (*en banc*).

The *Adair* court held that a coal conveyor belt, operating in a coke plant, was an improvement to real property for purposes of § 2305.131. In making that determination the court reasoned that the conveyor belt was "essential to the operation of the factory as designed and enhance[d] the utility of the property." *Id.* at 115. Thus, the court concluded, the test to determine whether something is an "improvement" is whether the object "'adds to the value of the realty, for the purposes for which it was intended to be used.'" *Id.* at 115 (quoting *Mullis v. Southern Co. Services, Inc.*, 250 Ga. 90, 296 S.E.2d 579, 583 (1982)).

The *Adair* court also looked to the permanence of the conveyor belt in determining whether it was an "improvement" for purposes of § 2305.131. The court found that the conveyor was a permanent fixture inasmuch as it was bolted in place, supported by steel angles on a concrete footing, was placed below ground level, contained walkways and handrails on either side of it, and had remained intact for a long period of time. *Id.* at 115.

Based upon the factors announced in *Adair* and their application in that case, this court is of the opinion that the slide in the present case was not an improvement to the school property for purposes of § 2305.131. It is true that the slide had been fixed into the ground since 1960. However, the slide did not add value to the school "for the purposes for which it was intended to be used," and that was primarily a center for learning. Ultra Play makes

the argument that the playground equipment and the playground itself add value to the teaching mission of the school. While that may be true in part, this court is not willing to find that the subject slide added any significant value to the educational objectives of the school. Certainly if the slide were removed and not replaced, the school's educational objectives would not be impaired in the slightest, unlike the situation in the *Adair* case where if the coal conveyor belt were removed, the coke plant's objectives would be significantly impaired. Accordingly, it is this court's view that the statute of repose claimed to preclude plaintiffs' claim is nonapplicable to the installation under discussion here.

Therefore, for the reasons stated herein, Ultra Play's motion for summary judgment with regard to Ohio's statute of repose § 2305.131 is hereby denied.

## V. ULTRA PLAY'S SECOND MOTION FOR SUMMARY JUDGMENT

### A. *Generally*

In its second motion for summary judgment, Ultra Play contends: (1) the knowledgeable purchaser defense prevents liability from being assessed against Ultra Play as a matter of law; (2) the intervening acts and omissions of the purchaser of the slide proximately caused the plaintiff's injuries and no liability can be assessed against Ultra Play as a matter of law; and (3) Ms. Hinton was not a bystander and as a matter of law cannot recover for negligent infliction of emotional distress.

### B. *Knowledgeable Purchaser Defense*

 Relying on *Smith v. Best,* 756 F.Supp. 878 (W.D.Pa.1990), *inter alia,* Ultra Play contends that it is not liable to plaintiff in negligence and had no duty to warn because the school district was a knowledgeable purchaser and had actual knowledge of the dangers of placing a slide over asphalt and had actual knowledge of the recommended side heights for slides listed in Volume I of guidelines published by the United States Consumer Product Safety Commission.

Plaintiffs contend that the knowledgeable purchaser defense is not applicable here because: (1) in those cases that have invoked this defense, the injured plaintiff is a highly skilled employee himself and/or works under the control and direction of other professional employees of the purchaser, neither of which is true in the present case; (2) genuine issues of material fact exist as whether the school district had ample information available to it in order that it may rise to the level of a knowledgeable purchaser; and (3) the knowledgeable purchaser defense is available only in negligence actions, and the present case is framed in negligence and strict liability.

In *Smith v. Best,* 756 F.Supp. 878 (W.D.Pa.1990), the United States District Court for the Western District of Pennsylvania applied the knowledgeable purchaser defense construing Ohio law. In that case the plaintiffs were injured as a result of exposure to silica sand while working at the Valley Mould and Iron Company. Plaintiffs sued the distributors of the silica sand. The *Smith* court looked at a number of cases that applied the knowledgeable purchaser defense, but noted that Ohio has not explicitly recognized the knowledgeable purchaser defense. After an analysis of those cases, the *Smith* court concluded that the employer was knowledgeable of silica-related hazards and was therefore in the best position to convey such knowledge to its employees. In addition, the sand suppliers reasonably relied upon the employer to convey any warnings to its employees and the suppliers had no duty to warn the employees of the hazards of prolonged exposure to silica sand. The *Smith* court reasoned that despite the fact that Ohio has not explicitly recognized the knowledgeable purchaser defense, the court was confident that the Ohio Supreme Court would recognize such a defense given the facts of that case, because the Ohio Supreme Court adopted § 388 of the Restatement[5] and the knowledgeable purchaser defense is an outgrowth of § 388.

---

**5.** § 388 *Chattel Known to be Dangerous for In-* *tended Use.*

Upon review of the cases discussed in *Smith* and the cases cited by Ultra Play, this court is not confident that the Ohio Supreme Court would recognize the knowledgeable purchaser defense in the instant cause. Those cases that have adopted such a defense typically involve the manufacturer or supplier of a potentially dangerous product who distributes that product to an industrial company which, itself, is very familiar with the potential dangers of the product. The industrial companys' skilled employees are then injured while using the potentially dangerous product in the course of their employment. *See generally Ryntz v. Afrimet Indussa, Inc.*, 887 F.2d 1087 (6th Cir.1989) (supplier of cobalt had no duty to warn lathe operator employee of potential dangers of cobalt dust); *Higgins v. E.I. Dupont de Nemours & Co., Inc.*, 671 F.Supp. 1055 (D.Md.1987), *aff'd*, 863 F.2d 1162 (4th Cir.1988) (buyer's redistribution of Imron paint in unlabeled cans constituted misuse which precluded recovery from manufacturer); *Rusin v. Glendale Optical Company, Inc.*, 805 F.2d 650 (6th Cir.1986) (manufacturer of protective spectacles had no duty to warn Chrysler's highly skilled diemakers of the availability of alternative products); *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd, Beele v. Hardy*, 769 F.2d 213 (4th Cir.1985) (suppliers of silica sand had no duty to warn foundry employees of potential dangers of sand because the Lynchburg Foundry had been knowledgeable of the risks and dangers since the 1930's); *Strong v. E.I. DuPont de Nemours Company*, 667 F.2d 682 (8th Cir.1981) (manufacturer of pipeline connector had no duty to warn professional construction supervisor injured by explosion that there was a potential for leakage as purchasing gas company and construction supervisor knew of that potential); *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457 (5th Cir.1976) (benzene manufacturer's warning cards were adequate enough to warn shipping company's professional stripping crew of the product's danger as shipping company and stripping crew had knowledge of such danger); *Jacobson v. Colorado Fuel and Iron Corporation*, 409 F.2d 1263 (9th Cir.1969) (steel manufacturer had no duty to warn construction foreman about the dangers of pre-stressed concrete as employer had knowledge of the potential dangers); *Marker v. Universal Oil Products Co.*, 250 F.2d 603 (10th Cir.1957) (manufacturer of closed reactor vessel who warned purchaser employer that only "cold catalyst" could be used when recharging the vessel had no duty to warn employees of the dangers of using a "hot catalyst" as this information was within the technical knowledge of the employer); *Hopkins v. E.I. DuPont de Nemours Co.*, 212 F.2d 623 (3d Cir.1954) (manufacturer had no duty to warn the employee because the supervisor with knowledge of the danger was directing the work); *Cruz v. Texaco, Inc.*, 589 F.Supp. 777 (S.D.Ill.1984) (truck seller had no duty to warn trained employee driver that the truck should not be used at highway speeds when heavy objects were suspended at the rear of the truck as employer was fully aware of the dangers).

This court is not willing to adopt the knowledgeable purchaser defense, a doctrine that has not been explicitly recognized by the Ohio Supreme Court, to the facts of the present case which differ so greatly from those cases cited above. There is simply no precedent upon which this court can sustain the view that the knowledgeable purchaser defense applies in this case. Therefore, Ultra Play's mo-

---

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier:
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
Second Restatement of Torts § 388.

tion for summary judgment is denied with regard to the knowledgeable purchaser defense.

## C. Intervening Cause

 Ultra Play contends that the school district was fully aware of the dangers of an eight foot fall slide placed on asphalt and fully aware that two other students had fallen off the same slide onto the asphalt and were injured as a result. Ultra Play further contends that, notwithstanding this knowledge, the school allowed children of tender years to climb the eight foot slide above the hard surface. Accordingly, defendant contends that the acts and omissions of the school and school district intervened between any alleged design defect or failure to warn on the part of Ultra Play and proximately caused the plaintiff's injuries.

Plaintiffs contend that there was no independent intervening cause in this case and plaintiff would never have been injured at all absent the defective design of the slide which proximately caused plaintiff's injuries. Plaintiffs add that Jacob Hoover was using the slide in a completely normal fashion.

Both parties cite to *Grover Hill Grain Co. v. Baughman–Oster, Inc.*, 728 F.2d 784 (6th Cir.1984) in support of their respective contentions. In that case the Sixth Circuit stated:

> The law of Ohio requires that an efficient intervening cause, in order to break the chain of causation, must be one 'not brought into operation by the original wrongful act, but operating entirely independent thereof; it must be such a cause as would have produced the result, without the cooperation of the original wrong.' Ultimately, the determination whether an independent and intervening act is sufficient to cut off the chain of causation is a factual issue.

*Id.* at 791–92 (citations omitted).

Inasmuch as the determination of whether an independent and intervening act is sufficient to break the chain of causation is a factual issue, this court is of the opinion that the question of intervening cause is better left for the jury. Accordingly, Ultra Play's motion for summary judgment with regard to the issue of intervening cause is hereby denied.

## D. Negligent Infliction of Emotional Distress

 With regard to the issue of negligent infliction of emotional distress both parties cite to *Burris v. Grange Mutual Companies*, 46 Ohio St.3d 84, 545 N.E.2d 83 (1989). In accordance with *Burris*, "a bystander to an accident may recover if the emotional injuries were both serious and reasonably foreseeable." *Id.* at 92, 545 N.E.2d 83 (citing *Paugh v. Hanks*, 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759 (1983)).

The Ohio Supreme Court set forth the following factors, in *Paugh* and again in *Burris* to be considered, although not necessarily determinative, in deciding the question of foreseeability:

> (1) Whether the plaintiff was located near the scene of the accident, as contrasted with one who was a distance away;
>
> (2) whether the shock resulted from a direct emotional impact upon the plaintiff from sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and,
>
> (3) whether the plaintiff and victim (if any) were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Burris*, 46 Ohio St.3d at 92, 545 N.E.2d 83.

Citing to *Binns v. Fredendall*, 32 Ohio St.3d 244, 245, 513 N.Ed.2d 278, 280 (1987), the *Burris* court observed that in *Paugh* the court extended the negligent infliction of emotional distress cause of action to persons *who observe an accident as bystanders* but who are not directly involved in the accident. *Burris*, 46 Ohio St.3d at 93, 545 N.E.2d 83 (emphasis in original). The *Burris* court noted that: "[t]he only logical definition of 'bystander' is 'one who is at the scene.' 'Bystander' does not in-

clude a person who was nowhere near the accident scene and had no sensory perception of the events surrounding the accident." *Id.* The *Burris* court added that: "this court clearly required [in *Paugh*] some type of sensory perception of the accident or events following immediately thereafter. *Id.*

The operative facts relating to this claim are not in dispute. Ms. Hinton received a call at work, from someone at her son's school, informing her that her son was hurt and to come as soon as she could. Hinton Depo. at 9. Ms. Hinton's place of employment was located 10 to 15 minutes away from the school. *Id.* at 12. When she arrived at the school her son was in the ambulance and was not "awake." *Id.*

Plaintiff contends that the ambulance was at the accident scene itself, having driven right onto the blacktop. Plaintiff further contends that she arrived at the accident scene and experienced the shock of seeing her only child lying unresponsive and injured. Plaintiff cites to *Archibald v. Braverman*, 275 Cal.App.2d 253, 256, 79 Cal.Rptr. 723, 725 (1969) which is cited by the *Burris* court. The California court stated: "[m]anifestly, the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself." *Archibald*, 275 Cal.App.2d at 256, 79 Cal.Rptr. 723. This court concurs in that view but is constrained, of course, to follow the Ohio precedent.

Defendant contends that Ms. Hinton was not a bystander in that she was not present when her son fell, but arrived after her son had been removed from the scene of the fall and was already in the ambulance. Defendant further argues that plaintiffs' complaint does not state a claim upon which relief can be granted because the complaint fails to allege that Ms. Hinton saw the accident and/or otherwise sensorially perceived the accident. Plaintiffs' respond by asking the court to allow them to amend their complaint to include the allegation that Ms. Hinton sensorially perceived the accident.

Even assuming plaintiffs' amended their complaint, this court is of the opinion that the facts in this case do not support the Ohio Supreme Court's determination of what constitutes a claim for negligent infliction of emotional distress. The mandate of the Ohio Supreme Court in *Paugh* and *Burris* is clear. While the negligent infliction of emotional distress cause of action extends to a bystander not directly involved in the accident, that bystander must be "one who is at the scene." *Burris*, 46 Ohio St.3d at 93, 545 N.E.2d 83. In addition, Ms. Hinton fails to meet two of the three factors announced in *Burris* and *Paugh* which a court is to consider in deciding whether "the emotional injuries were ... reasonably foreseeable." *Burris*, at 92, 545 N.E.2d 83. Specifically: (1) Ms. Hinton was not located near the scene of the accident, but was some distance away; and (2) the shock Ms. Hinton experienced did not result from her sensory and contemporaneous observance of the accident, but from learning of the accident from others after its occurrence.

Plaintiff cites to *Archibald, supra,* which is cited in *Burris,* in support of her contention. In *Archibald,* a 13-year old boy was severely injured in an explosion in which he sustained traumatic amputation to his right forearm and left hand and lost copious amounts of blood. *Archibald,* 275 Cal.App.2d at 255, 79 Cal.Rptr. 723. "*[W]ithin moments* of the actual explosion, the plaintiff appeared at the scene in an effort to render aid to her son...." *Id.* (emphasis added). The facts of the *Archibald* case are readily distinguishable from the present case.

This court means neither to understate nor minimize the shock and anguish Ms. Hinton must have experienced upon her hearing of the accident and upon seeing her son in the ambulance. However, it is the opinion of this court that the facts surrounding the accident do not meet the legal criteria for a claim based on negligent infliction of emotional distress as set out by the Ohio Supreme Court in *Paugh* and *Burris.*

Accordingly, for the reasons stated above, Ultra Play's motion for summary judgment is granted as to plaintiff's claim for negligent infliction of emotional distress.

## VI. CONCLUSION

For the reasons stated herein, this court hereby denies Ultra Play's first motion for summary judgment (Docket No. 31) as to the issues of personal jurisdiction, successor liability, and the statute of repose, but notes that only the mere continuation exception to the issue of successor liability is available to the plaintiffs, and not the assumption of liability exception. This court hereby grants Ultra Play's first motion for summary judgment with regard to the issue of "independent duty to warn." Further, this court hereby denies Ultra Play's second motion for summary judgment (Docket No. 96) as to the issues of the knowledgeable purchaser defense, and intervening cause, but grants Ultra Play's second motion for summary judgment with regard to the issue of negligent infliction of emotional distress.

IT IS SO ORDERED.