**CHRYSLER CORPORATION, Plaintiff,**

v.

**FORD MOTOR COMPANY, General Motors Corporation, County of Wayne, Michigan, The Charter Township of Ypsilanti, Ypsilanti Community Utilities Authority, and the Regents of the University of Michigan, Defendants,**

**and**

**FORD MOTOR COMPANY, General Motors Corporation, County of Wayne, Michigan, The Charter Township of Ypsilanti, Ypsilanti Community Utilities Authority, and the Regents of the University of Michigan, Third–Party Plaintiffs,**

v.

**CHRYSLER PENTASTAR AVIATION, INC., Third–Party Defendant.**

**Civil Action No. 95–72112.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 21, 1997.

forfeiture action. Such behavior indicates that Claimant Key knew about this proceedings.

Steven C. Kohl, Howard & Howard, Bloomfield Hills, MI, for plaintiffs.

Eugene Driker and John Libby, Barris, Sott, Denn & Driker, Detroit, MI, for defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

This dispute centers on response costs for the cleanup of pollution at the Willow Run Creek Site ("Willow Run") in Wayne and Washtenaw Counties. Willow Run is well known in Michigan as the site where Ford Motor Company produced bomber airplanes during World War II. Defendants are the previous and current owners and operators of Willow Run Airport, a nearby waste water treatment facility, and nearby industrial plants: Ford Motor Company ("Ford"), General Motors Corporation ("GM"), Wayne County, Ypsilanti Township, the Ypsilanti Utilities Authority, and the University of Michigan Regents. These parties negotiated a consent decree with the Michigan Department of Natural Resources ("MDNR", now Michigan Department of Environmental Quality, "MDEQ"), acting as an agent for the United States Environmental Protection Agency ("EPA"), to implement a remedial action plan for Willow Run pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The consent decree was entered in March 1995.

Plaintiff Chrysler Corporation ("Chrysler") was not a party to the 1995 consent decree, though in July 1993 it had received notice that it was a potentially liable party under CERCLA § 107(a), 42 U.S.C. § 9607(a). Chrysler filed this lawsuit seeking a declaratory judgment that it is not liable for response costs under CERCLA or the Michigan Environmental Response Act ("MERA", now the Natural Resources and Environmen-

**1100**

tal Protection Act, "NREPA"), M.C.L. § 324.20101 *et seq.* Chrysler's complaint seeks a declaration that it is not liable for CERCLA or MERA response costs because of its 1987 purchase of a company formerly know as Kaiser Manufacturing Corporation ("KMC"), which had been a subsidiary of the Kaiser–Frazer Corporation ("KFC"). Chrysler denies that it is a successor in interest to KFC by virtue of its purchase of KMC. While Chrysler admits that it is the successor to KMC, it seeks a declaration that KMC did not "own," "operate," or "arrange" for disposal of hazardous substances at Willow Run as defined by CERCLA or MERA.

Defendants filed a counterclaim in which they asserted that Chrysler is not only liable as the successor to KFC and KMC, but also that Chrysler and third-party defendant Chrysler Pentastar Aviation, Inc. ("Pentastar") are directly liable by virtue of their own activities at Hangar One of the Willow Run Airport. In addition to CERCLA and MERA liability, defendants assert theories of public nuisance and undue enrichment.

A November 7, 1995 stipulated case management order separated liability issues ("Phase I") from allocation questions ("Phase II"). After I denied motions for summary judgment from both sides, a bench trial was begun on July 15, 1997 on Phase I issues. The issues at trial were limited to Chrysler's successor in interest liability.

For the reasons stated below, I find that Chrysler is not the successor in interest to KFC and therefore is not liable under CERCLA, MERA or the common law for releases of hazardous wastes by KFC. I do not now rule whether Chrysler's acknowledged predecessor in interest, KMC, was an "operator" or "arranger" under CERCLA and MERA. Neither do I decide the amount of Chrysler and Pentastar's liability for activities in Hangar One; since Chrysler and Pentastar admit liability for Hangar One as a threshold matter, the only remaining issue is cost allocation, which has not yet been subject to discovery or argument.

## I. *Jurisdiction*

This court has exclusive jurisdiction over the CERCLA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). I exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. Authority to issue a declaratory judgment and other necessary relief is provided by 28 U.S.C. §§ 2201 and 2202. Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 42 U.S.C. § 9613(b).

## II. *Background*

Key to this case is the relationship between a parent and subsidiary corporation controlled by the Kaiser family. The parent, Kaiser–Frazer Corporation, produced motor vehicles at the Willow Run Manufacturing Plant from 1946 to 1953. By the time KFC's manufacturing and assembly operations at Willow Run ended, it was known as Kaiser Motors Corporation. Subsequently, a 1956 reorganization turned the corporation into a holding company for various Kaiser interests, at which point it was known as Kaiser Industries.

The subsidiary, Kaiser Manufacturing Corporation, was created when a formerly inactive KFC subsidiary, Phoenix Iron Works Corporation, was activated in 1951. As will be discussed in greater detail, this was done in order to secure contracts for military aircraft which were also produced at Willow Run in the following years. In 1953, KMC changed its name to Willys Motors Corporation when it bought the assets of Willys–Overland of Toledo, Ohio. It was later renamed Kaiser–Jeep until its stock was purchased by American Motors Corporation ("AMC") in 1970. Chrysler in turn purchased AMC and its wholly-owned Jeep subsidiary in 1987.

For the sake of simplicity, throughout this opinion I refer to the parent corporation as "KFC" and the subsidiary as "KMC" (*i.e.*, Kaiser Manufacturing Corporation, as distinct from the parent Kaiser Motors Corporation). I refer to the Chrysler Corporation in the singular as "Chrysler" or "plaintiff," although Chrysler Pentastar Aviation, Inc., was named as a third-party defendant for its activities at the Willow Run Airport.

Chrysler acknowledges that its purchase of AMC makes it a successor in interest to the liabilities of KMC, but maintains that KMC had no activities at Willow Run which could give rise to liability. Chrysler denies the defendants' claim that KMC was the succes-

sor to KFC, and thus denies that its purchase of AMC carried with it liability for KFC's activities at the site.

Defendants' claim of successor liability is based on several theories. They assert that when KMC purchased KFC's assets in 1956, KMC contractually assumed all of KFC's liabilities, including CERCLA liability. In the alternative, if there was not a contractual assumption of liability, they maintain that the sale created a *de facto* merger of the two corporations. Finally, they argue that from the time of KMC's activation in 1951 it was in effect the "alter-ego" of KFC and thus should be held liable for KFC's waste. In other words, defendants seek to "pierce the corporate veil" and thereby ignore the formal separation of the two companies.

With this opinion, I resolve only Chrysler's successor in interest liability for KFC's pollution. I do not decide the extent to which KMC's activities may have generated direct liability under CERCLA (as an operator or arranger), or common law theories of public nuisance or unjust enrichment. Neither do I decide any issues related to the allocation of response costs, including costs resulting from Chrysler's operations of Hangar One at the Willow Run Airport, for which Chrysler has acknowledged threshold CERCLA liability.

### III. *Choice of law*

CERCLA does not limit or define successor in interest liability. The U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that this question is answered by the application of state corporation law principles rather than federal common law.

*Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1246 and 1248 (6th Cir.1991). State law applies to a determination of successor liability under an *alter-ego* theory, *United States v. Cordova Chemical Company of Michigan,* 113 F.3d 572, 580 (6th Cir. 1997), and under a theory based on the purchase of assets, *City Management Corp. v. U.S. Chemical Company Inc.,* 43 F.3d 244, 251 (6th Cir.1994).

The threshold question is, which state's law shall govern? [1] Defendants argue that the law of the state of incorporation should govern; since the purported successor liabilities of KMC are at issue, the law of the state of KMC's incorporation, Pennsylvania, would presumably control.[2] Plaintiff argues that Michigan law should apply because Michigan has the greatest interest in, and connection to, the events in question.

Previous cases involving CERCLA liability of alleged successor or *alter-ego* corporations have not directly confronted whether the law of the state of incorporation or the state with the greatest interest in the lawsuit should govern. A plurality concurrence in *Anspec* references the state of incorporation, without discussion; but from that opinion it appears that the state of incorporation was also the pollution site, so the choice faced in this case did not arise. *Id.* at 1248. Similarly, a later decision by the Sixth Circuit applied Michigan law where both predecessor and successor corporation were incorporated in Michigan. *City Management* at 250 (citing *Anspec, supra* ). But in that case, as well, Michigan was the site

---

**1.** No precedent clearly establishes whether the rules of the forum state (Michigan) or federal common law should govern the choice of state law here. Since jurisdiction arises under federal law rather than by diversity, forum state choice of law is not mandated. Some courts have held that where comprehensive legislation is silent on choice of law (as is CERCLA), forum state choice rules apply. *A.I. Trade Finance, Inc. v. Petra International Banking Corp.,* 62 F.3d 1454 (D.C.Cir.1995). Others have applied federal common law choice of law rules when faced with federal legislation. *Enterprise Group Planning, Inc. v. Elaine Falba,* No. 94–3827, 1995 WL 764117 (6th Cir. Dec.27, 1995) (unpublished); *Aaron Ferer & Sons Limited v. Chase Manhattan Bank,* 731 F.2d 112, 120–121 (2nd Cir.1984); *Halkias v. General Dynamics Corp.,* 31 F.3d 224, 237 (5th Cir.1994), *vacated on rehearing,* 56 F.3d

27 (5th Cir.1995). Because analysis under either framework leads me to the application of Michigan law, I need not choose between the two. In an area such as this one, federal common law borrows from state law principles in any event.

**2.** In her *Anspec* concurrence, Judge Cornelia G. Kennedy stated, "[T]he existence and status of a 'corporation' allegedly liable under section 9607 should be determined by reference to the law under which the 'corporation' was created." *Anspec* at 1248. Since the existence, status and liability of KMC are at issue, the relevant law would be that under which KMC was created, *i.e.,* Pennsylvania. Thus I reject the suggestion that the law of Delaware, the state of Chrysler's incorporation, or Nevada, the state where KFC was incorporated, might apply.

of pollution and other material events. This is an issue of first impression.

■ In matters of internal corporate governance, the law of the state of incorporation will ordinarily govern; while in matters external to the corporation, more general choice of law rules apply.

"[T]he law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. . . . Different conflicts principles apply, however, where the rights of third parties *external* the corporation are at issue."

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) (citing Restatement (Second) of Conflict of Laws §§ 301 and 302) (emphasis in original).

■ The choice of law in this case thus depends on whether the various successor in interest theories are characterized as internal corporate matters. Michigan law has not confronted this particular issue (as noted in the analysis of the *Anspec* and *City Management* decisions, above). The Restatement (Second) of Conflict of Laws provides useful guidance. Chapter 13, covering Business Corporations, contains the following language:

§ 301: The rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties.

§ 302:(1) Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.(2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some

other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

Thus if a corporation does an act that can be committed by a non-corporate entity, § 301 applies standard choice of law rules according to the particular liability involved (*e.g.,* contract or tort law); while if the act is one peculiar to corporations, the law of the state of incorporation will normally be applied, unless another state has a "more significant relationship" to the lawsuit.

A non-corporate entity may accrue CERCLA liability, and on that basis § 301 would appear to apply here, leading to the application of normal contract or tort choice of law rules. However, it could also be argued that successor liability or piercing of the corporate veil are theories of liability peculiar to corporations, in which case § 302 applies. Even if that is so, the terms of § 302 do not mandate the law of the state of incorporation in this case, where the matter is not one of internal corporate governance but rather external liability, and where Michigan has a far more significant relationship to the events in question than does the state of incorporation. The comment to § 302(2) states,

The reasons for applying the local law of the state of incorporation carry less weight when the corporation has little or no contact with this state other than the fact that it was incorporated there. In such situations, some other state will almost surely have a greater interest than the state of incorporation in the determination of the particular issue.

Rest. (Second) § 302, comment g. This is the case here, as the parties have stipulated that KMC's principal places of business were in Michigan, Ohio and California and not its state of incorporation, Pennsylvania; neither did any of the facts precipitating this lawsuit arise in Pennsylvania. Thus even under § 302, the law of the state with the greatest interest—in this case, Michigan—should prevail over the law of the state of incorporation.

More specific sections of the Restatement Chapter 13 which bear specifically on *alter-ego* and veil-piercing theories are § 307, Shareholders' Liability, and § 309, Directors' or Officers' Liability. In general terms, both

of these sections apply the law of the state of incorporation except where another state has a more significant relationship to the parties and the transaction.

> The local law of some state other than the state of incorporation is most likely to be applied to determine issues of this sort [regarding directors' or officers' liability] where the corporation does all, or nearly all, of its business and has most of its shareholders in this other state and has little contact, apart from the fact of its incorporation, with the state of incorporation.

Section 309, comment a. While the state of incorporation would have the greatest stake in disputes between the investors and directors or managers of a corporation, since "this is the law which the shareholders, to the extent that they thought about the question, would usually expect to have applied to determine their liability," § 307 comment a., the facts of this case are clearly otherwise.

Other district courts within the Sixth Circuit faced with a choice of law question regarding successor liability have declined to look to the state of incorporation. In two diversity personal injury cases, district courts applying forum choice of law principles characterized the liability of an alleged successor in a product liability suit as a tort matter, rather than a matter of corporate governance, and therefore applied tort choice of law rules. *Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136, 142 (E.D.Mich.1979); *Hoover v. Recreation Equipment Corp.*, 792 F.Supp. 1484 (N.D.Ohio 1991). In *Korzetz*, the court followed Michigan choice of law rules for tort actions and thus applied *lex locus delicti*, the law of the place of injury. *Korzetz* at 142. The court in Hoover held that Ohio choice of law principles for tort actions called for the law of the state with the most significant relationship to the lawsuit, considering factors in § 175 of Rest. of Conflicts (Second); the state where injury occurred had a more significant relationship than the state of incorporation. *Hoover* at 1491; *accord, Litarowich v. Wiederkehr*, 170 N.J.Super. 144, 150–151, 405 A.2d 874 (1979).

The logic behind these decisions is that a state's interest in applying its law to citizens injured by foreign corporations outweighs the interest of the incorporating state.

"[W]hile Indiana has an interest in seeing that its law governs asset purchase agreements entered into between two Indiana corporations, Ohio has a greater interest in seeing that Ohio law applies to its own citizens who may be *affected* by the legal implications of those agreements." *Hoover* at 1491 (emphasis in the original).

This logic also prevailed in the U.S. Court of Appeals for the Fifth Circuit, in a suit by the U.S. government against the shareholders of a Delaware corporation doing business in Louisiana. In determining whether to pierce the corporate veil, the court applied Louisiana law rather than that of the state of incorporation, because Louisiana had a more significant relationship to the lawsuit. *U.S. v. Clinical Leasing Service, Inc.*, 982 F.2d 900, 902 n. 5 (5th Cir.1992) (citing Restatement (Second) Conflicts of Law § 305).

A state which is the site of a CERCLA action similarly has interests which outweigh those of an incorporating state. A single CERCLA lawsuit may adjudicate the claims of a large number of actors, including the federal and state government and a variety of potentially responsible parties. The alleged successor (or *alter-ego* ) and those who seek to recover from it did not organize their relationship under the umbrella of the incorporating state's law, as would be the case in an internal dispute within a corporation or between a corporation and its shareholders. The interests here go far beyond corporate governance, as the acts of predecessor and successor corporation affect a wide range of interests outside the corporation. The state directly affected by the alleged corporate wrongdoing must be allowed to determine the extent to which the corporate veil may be pierced.

█ Having determined that law of the state of incorporation is not entitled to preference on successor liability issues, I must decide which state has the "most significant relationship" to the lawsuit. An elaborate consideration of various factors is not necessary, because nearly all point to the application of Michigan law.

The above-cited cases do not reach the question whether successor liability under CERCLA should be characterized as tort or contract for choice of law purposes. While

*alter-ego* theories relying on the piercing of the corporate veil might resonate in tort, following the guidelines laid out in § 145 of the Restatement, theories based on contractual or quasi-contractual assumption of liability would seem to invoke the provisions of § 188, which specifies factors to be considered in contract actions in the absence of effective choice of law by the parties. (The contract which allegedly gives rise to KMC's liability for KFC had no choice of law provision.)

Section 145 lists the following factors to be considered in tort cases: (a) the place of injury; (b) the place of the conduct causing the injury; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship between the parties is centered. Section 188 takes into account (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicil residence, nationality, place of incorporation and place of business of the parties.

Under either set of factors, Michigan law clearly has the strongest claim on all of the successor in interest issues in this case. The only factor pointing elsewhere is the fact that KMC was incorporated in Pennsylvania. All relevant injury (incurrence of cleanup costs) and conduct causing injury (release of hazardous substances) took place in Michigan. The alleged *alter-ego* or successor relationship between KFC and KMC is based on relationships between that parent and subsidiary which were negotiated and centered in Michigan and Ohio. The parties' stipulated facts indicate that the principal places of business for KFC and KMC were Michigan, Ohio or California. (No party has ar-

gued that Ohio or California law has a claim here.) The broader choice of law principles set forth in § 6 of the Restatement [3] point to Michigan as well.

Thus Michigan law guides the application here of *alter-ego* theories of liability as well as contractual and *de facto* merger theories. As a matter of policy, a state in which a parent and its subsidiary do business must be able to regulate the extent to which one is liable for the wrongs of the other, particularly when those wrongs are committed within the state. This establishes predictability, consistency and ease of administration, as well as fundamental fairness. This is particularly true where there are pendant state law claims, as is true in this case. Regardless of the choice of law for CERCLA purposes, I will have to analyze the MERA and public nuisance claims under Michigan law, creating further complication if another state's law were to govern the successor issues.

It must be pointed out that the choice between Michigan and Pennsylvania law is not material so far as piercing the corporate veil is concerned, since the legal standards in the two states are substantially similar. As discussed below, the determinant factor in Michigan law is the requirement of fraud, subversion of justice, or circumvention of overriding public policy. *Cordova*, 113 F.3d at 580 n. 4. Under Pennsylvania law "the corporate form 'will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime.'" *First Realvest, Inc. v. Avery Builders, Inc.*, 410 Pa.Super. 572, 577, 600 A.2d 601 (Pa.Super.1991) (citing *Sams v. Redevelopment Authority of City of New Kensington*, 431 Pa. 240, 244 A.2d 779 (1968)).[4]

---

**3.** These factors include (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Rest. (Second) of Conflict of Laws § 6.

**4.** "[T]here is a strong presumption in Pennsylvania against piercing the corporate veil." *Lumax*

*Industries, Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 894 (1995), citing *Wedner v. Unemployment Compensation Bd. of Review*, 449 Pa. 460, 464, 296 A.2d 792, 794 (1972) ("[A]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."). The factors considered by Pennsylvania courts are undercapitalization; failure to adhere to corporate formalities; substantial intermingling of corporate and personal affairs; and use of the corporate form to perpetrate a fraud. *Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 669

So far as contractual assumption of liability is concerned, my holding is based on interpretation of contractual language and not determined by the particularities of state law. Thus here, too, the choice of law does not materially affect the outcome.

## IV. Successor Liability

### A. Alter-Ego Liability

Defendants argue that KMC was in effect the *alter-ego* of KFC. On that basis, they seek to "pierce the corporate veil" between KFC and KMC and thus hold Chrysler, as the acknowledged successor to KMC, liable for all wastes released by KFC.[5] A large part of the trial and thousands of pages of exhibits were devoted to the relationship between the two companies, *i.e.*, the observance (or non-observance) of corporate formalities, the commingling of corporate assets, and the interlocking of boards, management, and employees. Rather than sift through this voluminous evidence here, I first address the one determining question: the existence of fraud or wrongdoing.

The Sixth Circuit has recently stated that in addition to the existence of "such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist," some form of culpable conduct is required: "[T]he circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *United States v. Cordova Chemical Company of Michigan*, 113 F.3d 572, 580 (6th Cir.1997) (*en banc* decision). The court further clarified that wrongdoing may be established by abuse of the corporate form *either* to subvert justice *or* to circumvent overriding public policy. *Id.* at 580 n. 4; *see also Seasword v. Hilti, Inc.*, 449 Mich. 542, 548, 537 N.W.2d 221 (1995) ("[The] 'corporate veil' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or

cause a result that [is] contrary to some other clearly overriding public policy.'"); *In re RCS Engineered Products Company, Inc.*, 102 F.3d 223, 226 (6th Cir.1996) ("A court may find that one entity is the *alter-ego* of another and pierce the corporate veil upon proof of three elements: first, the corporate entity must be a mere instrumentality of another; second, the corporate entity must be used to commit a fraud or wrong; and third, there must have been an unjust loss or injury to the plaintiff. *Nogueras v. Maisel & Associates of Michigan*, 142 Mich.App. 71, 86, 369 N.W.2d 492, 498 (1985).")

▮ Thus the claimed functional integration of KMC and KFC, through interlocking boards of directors and common managers and employees, could not be sufficient to pierce the corporate veil unless there was an additional showing that this was done for a wrongful purpose. The motives of KFC and KMC in organizing their relationship are amply documented, as discussed below. Because their concern was patently to satisfy conditions imposed by creditors and by the U.S. government in awarding defense contracts, there can be no doubt that their intentions were fully lawful.

KMC was formed as a tool for KFC to secure U.S. government contracts and private credit. In May 1951 an inactive KFC subsidiary called Phoenix Iron Works Corporation ("Phoenix") was activated and its name changed to Kaiser Manufacturing Corporation ("KMC"). At the time of KMC's activation, KFC was already indebted and its valuable assets were all held as security for its loans, preventing it from securing more credit. The Bank of America and Mellon Bank had previously loaned KFC $20 million. The Reconstruction Finance Corporation ("RFC") had loaned KFC $34.4 million in 1949, and loaned a wholly-owned subsidiary of KFC, Kaiser–Frazer Sales Corporation

A.2d 893, 894 (1995), citing *Kaites v. Dept. of Environmental Resources*, 108 Pa.Cmwlth. 267, 273, 529 A.2d 1148, 1151 (1987). This multifactor approach might not on the surface appear to require fraud, wrongdoing, or circumvention of public policy. However, given the preceding admonitions from Pennsylvania courts it is clear that failure to adhere to corporate formalities would not, by itself, be sufficient to pierce the corporate veil.

5. Defendants seek to assign to a subsidiary, KMC, liability for the pollution of the parent, KFC. Defendants acknowledge that veil-piercing is usually done to impose liability on the parent for acts of the subsidiary. However the corporate veil may be pierced to hold a subsidiary liable for its parent's actions as well. *Shirley v. Drackett Products Co.*, 26 Mich.App. 644, 648–49, 182 N.W.2d 726 (1970). Chrysler has not argued to the contrary.

("K–F Sales"), $10 million in 1949 and $25 million in 1950. As security, the RFC had been given a mortgage on the Willow Run Plant and a security interest in KFC's other assets, including equipment, tooling and account receivables. The RFC received a pledge of stock in KFC subsidiaries, including Phoenix and K–F Sales. The RFC loans were also secured by a $20 million guarantee from the Kaiser family's privately held company, Henry J. Kaiser Co. ("HJKCO"). (Statement of Stipulated Facts, hereafter "SF," nos. 48–49). At the time of the 1949 loans, the liquidation value of KFC's assets was $37.3 million, or approximately half of the debt to the RFC. (SF no. 52.)

U.S. government agencies required KFC to seek defense contracts, and required the formation of KMC as a separate entity to execute those contracts. KFC agreed to seek defense contracts as a condition for an additional RFC loan of $25 million to K–F Sales in 1950. (SF no. 55.) In 1950 the U.S. Air Force ("USAF") contracted with KFC for the production of C–119 aircraft at the Willow Run Plant and R–1300 engines at other Michigan plants. Given KFC's financial difficulties, in order to finance performance of the defense contracts, a new entity was needed whose assets and profits could be insulated from its troubled parent. KMC was formed for this purpose. In June 1951, KMC borrowed $25 million from the Bank of America and Mellon Bank to finance performance of the defense contracts. The USAF "V Loan" program provided a 90% guarantee for the loan "and mandated the assignment of the defense contracts to KMC." (SF no. 59.)

In June 1951, KFC duly assigned the C–119 contracts to KMC, and then the two companies executed subcontracts in which KFC agreed to provide all labor and services for the aircraft production at cost. (SF no. 60.) In October 1952, the two companies signed a similar subcontract for the performance of a contract for production of C–123 aircraft. (SF no. 62.) KMC was not operational as a manufacturer.

The relationship between KFC and KMC was overseen by government agents and independent auditors. As a condition of the 1950 loan, the RFC was given the right to appoint a representative to the KFC Board of Directors, which it did on July 31, 1952 when it named Alan E. Schwartz. Schwartz testified that his task was to advise the RFC of what happened in KFC board meetings, though he was not involved in day-to-day management.[6] (SF no. 67.) Cost allocation and cost segregation between the companies were subject to audit by USAF personnel at the Willow Run Plant. (SF no. 70.)

These facts disclose the actual purpose behind KMC's activation and its contractual relations with KMC. This was to secure credit for the performance of defense contracts, and to satisfy creditor-imposed requirements that those contracts be insulated from the troubled KFC. Not only was this purpose legal, it was explicitly known to, and approved by, the U.S. government, creditors and shareholders. There is no additional evidence in the record which indicates that anyone connected with KFC or KMC had another purpose in mind.

Neither is any improper purpose apparent in the subsequent relations between the parent and subsidiary. In mid–1953 the C–119 and C–123 contracts were terminated by USAF "for its convenience." (SF no. 65.) KFC was still in poor financial shape, having lost $12 million in 1951 and over $4.7 million in 1952. In these circumstances, KMC purchased the Willys–Overland Corp. in Toledo Ohio and changed its name to Willys Motors Corporation. The RFC approved of the purchase. (SF no. 74.) The purchase was financed in part through new loans from Bank of America and Transamerica Bank, which allowed KMC (now Willys Motors) to pay $15 million on outstanding RFC loans, and thereby obtain the release of the RFC pledge of KMC stock and HJKCO guarantees. KMC was then able to invest $10 million in KFC and loan KFC an additional $6.5 million. (SF no. 76.) The purpose was clearly to enable the financial survival of KFC.

**6.** The RFC also obtained KFC's voting rights in its wholly-owned subsidiaries, including KMC. On December 5, 1952, Schwartz was instructed to use the RFC proxy to re-elect the KMC Board of Directors, none of which were U.S. government representatives. (SF no. 66.)

At the time of KMC's purchase of Willys, it was expected that KFC and KMC each would provide services to the other. The terms of loans to KMC for that purchase required cost and expense accounting between KMC and KFC, and a methodology was developed by an independent accounting firm, Ernst & Ernst, with the approval of Transamerica Bank. At least two written joint operating agreements reflected these lender requirements. The audited financial statements of the two companies indicated that the loan restrictions had resulted in the effective segregation of assets and earnings, though many operational areas were consolidated. (SF nos. 88–91.) After the Willys purchase, passenger car production ceased at the KFC Willow Run Plant, which was sold to General Motors in late 1953. GM leased the plant back to KFC, which continued production of component parts. By August 1954, production had ceased and only three Willow Run personnel remained to oversee storage of KFC tooling and parts. (SF nos. 80–84.) In January 1955, KFC entered the Argentine car market, with the approval of the RFC.

In March 1956 a reorganization turned HJKCO into a wholly-owned subsidiary of KFC, and entities owned or controlled by HJKCO, the Kaiser family's privately held corporation, became indirect subsidiaries of KFC. The Internal Revenue Service ("IRS") gave KFC a letter ruling that the exchange of stock would be a tax-free reorganization. This infusion of capital allowed KFC (by then, Kaiser Motors) to pay off its outstanding debt to the RFC and restructure its commercial debt. As part of this transaction, KMC purchased KFC's assets and assumed its liabilities in January 1956. After the reorganization, KFC became purely a holding company, and its name was changed to Kaiser Industries Corporation. KFC (now Kaiser Industries) sold its stock in KMC (Willys) to American Motors Corporation. KFC formally dissolved in 1977 and wound up its affairs during the 1980s. (SF nos. 99–108).

Thus it is apparent that all collaboration between KFC and KMC was approved and monitored by the company's stockholders, the U.S. government, commercial lenders, and outside auditors. Favorable tax and credit consequences were an open and expected consequence of these arrangements. There was nothing illegal or improper about the relationship. Most significantly, there was no contemporaneous impairment of the rights of any creditors.

Nevertheless, defendants have attempted to argue that the arrangement between KFC and KMC violated public policy because it ultimately insulated the companies from environmental liability. "Recognition of the separate corporate existence of KFC and KMC would mean that no monies were available to remediate the pollution from the Willow Run Manufacturing Plant after 1949." (Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law at 75.) Defendants argue that KFC could have been found liable under environmental laws in effect during its existence, in particular the Water Resources Commission Statute of 1929 and common law public nuisance rules, and have introduced evidence of contemporaneous awareness that KFC was releasing hazardous wastes.

There is no evidence in the record that when structuring their relationship KFC and KMC considered any environmental cleanup costs. In addition, the mere potential for liability is not the same as actual liability. Nobody ever asserted an injury amounting to public nuisance during the time of KMC and KFC's existence, and neither were the procedures for enforcement of the Water Resources Commission Statute of 1929 initiated. With no adjudication of liability, I cannot say that such liability existed at all.

■ Finally, the lawful use of the corporate form to avoid personal liability is not cause for piercing the corporate veil. "Organization of a corporation for the avowed purpose of avoiding personal responsibility does not itself constitute fraud or reprehensible conduct justifying a disregard of the corporate form." *Cordova* at 580 (citing *Gledhill v. Fisher & Co.,* 272 Mich. 353, 359, 262 N.W. 371, 373 (1935)).

A party seeking to pierce the corporate veil must show, at a minimum, that the corporate form was abused in a manner which circumvented overriding public policy. The evidence in this case does not support such a finding, let alone a finding of actual fraud or

wrongdoing. Thus there is no basis to hold KMC responsible for pollution released by KFC.

## B. Joint Venture

■ Another theory that defendants put forward is that of a joint venture between KMC and KFC, which would make KMC liable for waste produced in KFC's Willow Run bomber production. Under Michigan law, a joint venture requires (a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking; (c) a single project for profit; (d) a sharing of profits as well as losses; (e) contribution of skills or property by the parties; and (f) community interest and control over the subject matter of the enterprise. *John Harris & Associates, Inc. v. Day*, 916 F.Supp. 651 (E.D.Mich.1996) (citing *Berger v. Mead*, 127 Mich.App. 209, 214–15, 338 N.W.2d 919 (1983)). Although the Sixth Circuit has acknowledged that "at least conceivably" there could be a joint venture between parent and subsidiary, *Cordova* at 579, I do not find that necessary elements outlined above are present in this case.

■ Defendants' allegations of joint venture are based on KMC's contracts for production of C–119 and C–123 aircraft and KMC's subcontracts with KFC for performance. As noted above, these subcontracts were explicitly on a no-profit, no-loss basis. Thus there was no sharing of profits and losses. The companies were not partners in a common enterprise, but acted rather as contractor and subcontractor. The contracts consistently refer to the parties in those terms. Each contains a clause stating that KFC ("the subcontractor") will "perform all work called for by said [supply or facilities] contract as an independent contractor and not as an agent of the Contractor [KFC]." [7]

Relatively few cases have considered a joint venture theory for CERCLA liability, perhaps because so many other avenues of

liability are usually available. One case where such liability was found is *U.S. v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984 (D.S.C.1984) *aff'd in part, vacated in part on other grounds by United States v. Monsanto*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). That court's finding was based on the existence of a written contract establishing the joint venture, which provided that each party would receive fifty percent of the net profits. *Id.* at 1005. This reflects an entirely different relationship than the subcontractor relationship entered into between KMC and KFC.

## C. Contractual Merger

■ As part of a corporate reorganization in early 1956, KMC (then known as Willys Motors) purchased the assets of KFC (then known as Kaiser Motors). The January 17, 1956 sale agreement specified that KMC would assume KFC's liabilities, including "all liabilities of Kaiser [Motors, f/k/a KFC] existing on the closing date of every nature whatsoever, whether absolute of contingent," followed by exceptions which are not relevant here.[8] In a March 15, 1956 instrument executing the sale, KMC formally assumed those labilities "absolutely and forever."

Defendants maintain that with this contract KMC assumed all of KFC's environmental liabilities, including those arising under the CERCLA statute enacted some 24 years later, and thus Chrysler, as the admitted successor to KMC, inherited liability for KFC's pollution. According to defendants, CERCLA liability was an "existing" contingent liability at the time of the sale, because KFC had already released the waste which in the future would give rise to liability.

On its face, defendants' argument seems to stretch the meaning of the word contingent. A contingent liability is defined as, "One which is not now fixed and absolute, but

---

7. Language stating that KFC would purchase materials and supplies as an agent of KMC simply reflected the parties' intent that KMC, as the contractor, would supply the materials. It does not indicate that KFC acted as an agent of KMC in the aircraft production; in fact, the limitation of agency to the purchase of materials and supplies indicates to the contrary.

8. The clause continues, "except liabilities to the extent covered by insurance and liabilities, if any, which Kaiser may then have to Graham–Paige Corporation, a Delaware corporation, Henry J. Kaiser Company, a Nevada corporation (herein called 'HJKCO') and Reconstruction Finance Corporation, a United States Government corporation, or any one or more of them."

which will become so in the case of the occurrence of some future and uncertain event." BLACK's LAW DICTIONARY, 321 (6th Ed.1990). To say that the "future event" may include the passage of a law creating the liability is pointless and illogical. A liability is nonexistent until it is created by law. Were it otherwise, there would be no distinction between a contingent liability and a future-arising liability, making the contractual assumption of both redundant. In this case, there was no mention of future-arising liability. To the contrary, the parties specifically limited liabilities to those "existing on the closing date."

One court which interpreted strikingly similar contractual language under Michigan law reached the same conclusion. *U.S. v. Vermont American Corp.*, 871 F.Supp. 318 (W.D.Mich.1994). There, in a pre-CERCLA contract the purchasing corporation assumed "all additional debts, obligations, and liabilities of the Seller, *whether or not matured and whether or not contingent, existing on the Closing Date . . . ." Id.* at 321 (emphasis in original). Although the buyer assumed all contingent liabilities, the court found this did not include CERCLA liability: "[T]here is no question that the CERCLA liability was not a liability that existed on the closing date." *Id.*

Other courts have held that a broad pre-CERCLA assumption of contingent liabilities can include CERCLA. *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir.1994), *cert. denied,* 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995); *SmithKline Beec-ham Corp. v. Rohm and Haas Co.*, 89 F.3d 154 (3d Cir.1996); *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal,* 14 F.3d 321 (7th Cir.1994), *reh. denied* (Feb. 9, 1997); *U.S. v. Hardy,* 916 F.Supp. 1385 (W.D.Ky. 1996).[9] To the extent that the contracts in question were limited to existing liabilities, I do not agree with this reasoning, and I am not controlled by it. But these cases are also distinguishable from the present one.

Although CERCLA was not yet in force at the time of the contracts in the aforementioned cases, all of these agreements were made in an era when Congress had undertaken far-reaching environmental legislation[10], and any corporation would be cognizant of environmental costs. Given the awareness of pollution costs in the 1970s, a broad acceptance of all contingent liabilities at that time likely included environmental cleanup, and thus might be said to include CERCLA liability even before that legislation had been enacted.

The facts of these cases indicate an awareness of environmental costs. In *Beazer*, the buyer agreed to assume obligations for ongoing compliance with environmental regulations. 34 F.3d at 209. In *SmithKline*, the seller had undertaken some remediation and pollution was discussed at the time of sale. 89 F.3d at 157. The provision in *Kerr–McGee Chemical* promised to assume losses resulting from "the maintenance of any . . . claim . . . concerning pollution or nuisance. . . ." 14 F.3d at 327. The contract in *Hardy* assumed costs "resulting directly or

**9.** These cases for the most part concern indemnification agreements, rather than the direct assumption of liability. CERCLA provides that no indemnification agreement shall be effective to transfer liability from one party to another, though one party may agree to indemnify another or hold the other harmless. 42 U.S.C. § 9607(e). Thus KMC's promise could not have absolved KFC of CERCLA liability, but could only serve to make KMC responsible for KFC's liability, which would have remained joint and several. *SmithKline,* 89 F.3d at 158; *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 14 (2d Cir.1993). Chrysler has not argued that this *per se* prevents the operation of the 1956 contract to transfer liability to KFC.

**10.** Though Congress legislated on water pollution in the Federal Water Pollution Control Act passed in 1948, Pub.L. No. 80–845, 62 Stat. 11555, and in subsequent amendments, this legislation was deferential to industry. It was not until the Amendments of 1972, Pub.L. 92–500, 86 Stat. 816, supplemented by the Clean Water Act of 1977, Pub.L. 95–217, 91 Stat. 1566, that Congress established the framework in place today. Stephanie L. Hersperger, *A Point Source of Pollution Under the Clean Water Act: A Human Being Should Be Included,* 5 Dick.J.Envtl.L. & Pol'y 97 (1996). Similarly, the Air Pollution Control Act of 1955, 69 Stat. 322, had a primary focus on research and support for state programs, and federal control of pollution was established through the Clean Air Act of 1963, Pub.L. No. 88–206, 77 Stat. 392, the Air Quality Act of 1967, Pub.L. No. 90–148, Pub.L. No. 90–148, 81 Stat. 465, and the Clean Air Act Amendments of 1970, 1977 and 1990, Pub.L. No. 91–604, 84 Stat. 1676; Pub.L. No. 95–95, 91 Stat. 685; Pub.L. No. 101–549, 104 Stat. 2399.

indirectly by the collection, transportation, and disposal [of hazardous materials]." *U.S. v. Hardy,* 916 F.Supp. at 1390. It is strange, indeed, that the courts in these cases so broadly interpreted the concept of existing contingent liability, rather than relying upon the facts presented to them to link the contractual language to the awareness and expectations of the parties as to those liabilities.

In contrast, the KMC asset purchase from KFC took place decades before federal environmental enforcement became a reality. Neither the language nor the implied intentions of the parties indicates any reference to environmental costs whatsoever. Thus even under *Beazer's* formulation that a pre-CERCLA contract can include CERCLA liability, if it is "either specific enough to include CERCLA liability or general enough to include any and all environmental liability," 89 F.3d at 211, there would be no CERCLA liability in the instant case. An assumption of all existing contingent liabilities might be considered "general enough to include ... environmental lability" in an era when such liability is a generally understood contingency. In 1956, this simply was not the case.

Neither is there any indication that the enforcement of state environmental law against KFC was an existing contingency at the time of the 1956 sale. There is no evidence that any party existed who might have sustained injury of the type that could support a suit for public nuisance. And while the Water Resources Commission Statute of 1929, P.A.1929, no. 245, regulated discharge of waste, there is no evidence that state authorities considered or attempted enforcement against KFC, or that KFC's conduct would have resulted in liability under that statute. The enforcement mechanisms contained in that statute required notice of violations, hearings, an order from the Michigan Water Resources Commission ("Commission"), and review by the Michigan Circuit Court. M.C.L. 323.7. The notice provided an opportunity to correct the violation "within a reasonable period of time." *Id.* Absent any notice of a possible violation from the Commission, I cannot assume that potential liability under this statute existed.

█ It is a fundamental principle of contract law that the parties must have a meet-

ing of the minds on all material facts, *i.e.,* there must be mutual assent in order for the contract to be valid. *Kamalnath v. Mercy Memorial Hosp.,* 194 Mich.App. 543, 548, 487 N.W.2d 499 (1992), *appeal denied,* 441 Mich. 923, 497 N.W.2d 185 (1993) (citing *Stanton v. Dachille,* 186 Mich.App. 247, 256, 463 N.W.2d 479 (1990)). When KMC accepted responsibility for contingent liabilities existing on the date of closing, neither party understood those contingent liabilities to include environmental liabilities. No such liability was disclosed in KFC's Annual Reports for the period. Chrysler presented uncontested testimony from an accounting expert, Robert J. Rock, that accounting industry standards require a contingent liability to be included on company balance sheets if it is probable and the cost can be estimated, and that any possible, material contingencies must be disclosed even if they are not probable. KFC's records were regularly audited by outside firms and no such environmental liability was ever recorded.

Of course, a party may contractually accept all future-arising liabilities, and thus accept liabilities not existing in either contingent or absolute form at the time of the contract. This was the case in *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 15 (2d Cir.1993) (purchase agreement required indemnifications for *"all liabilities ... as they exist on the closing date or arise thereafter"*) (emphasis in the original). In the present case, however, there was no such language. Therefore, KMC did not accrue environmental liability by virtue of the 1956 asset sale.

### D. De Facto Merger

█ Defendants argue that KMC's 1956 purchase of KFC's assets constituted a *de facto* merger of the two companies, providing an alternative basis for successor liability. A corporation which purchases assets from another corporation does not normally take on that corporation's debts and liabilities, *Clark v. Detroit Curling Club,* 298 Mich. 339, 342, 299 N.W. 99 (1941). But where the two companies merge in effect, if not formally, the resulting corporation takes on the liabilities of both. *Turner v. Bituminous Casual-*

*ty Co.,* 397 Mich. 406, 419–420, 244 N.W.2d 873 (1976); *Schmidt v. Wilbur,* 783 F.Supp. 329, 331–32 (E.D.Mich.1992).

 The requirements for *de facto* merger under Michigan law are: (1) continuation of the enterprise of the seller corporation, with continuity of management, personnel, physical location, assets, and general business operations; (2) continuity of shareholders, resulting from the purchasing corporation's use of its own stock to purchase the acquired assets; (3) the seller. corporation must cease ordinary business operations, liquidate and dissolve as soon as legally and practically possible; and (4) the purchasing corporation must assume the liabilities and obligations of the seller necessary for the uninterrupted continuation of normal business operations of the seller.[11] *Turner* at 420 (quoting *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974)).

 The *de facto* merger doctrine seeks to prevent one company from transferring its assets to a second company and dissolving, thus sheltering its assets from creditors, and then continuing its former business as the second company. This was patently not the intent or the effect of the 1956 asset sale. Far from dissolving after it sold its assets to KMC, KFC survived as a holding company with substantial assets until its formal dissolution in 1977. The assets sale was part of a broader reorganization which permitted KFC to pay off debt to the RFC and commercial lenders.

Neither did the assets sale bring about a continuity in the operations of KMC and KFC. In 1953 KMC had purchased Willys Overland and begun production as Willys Motors in Toledo, Ohio. KFC's car production at Willow Run ceased in late 1953, when the plant was sold to GM, and its parts production stopped some two years before the 1956 assets purchase. While KMC did

manufacture passenger cars, including the Kaiser, in its Toledo plant, the parties agree that this had ceased by 1955. (SF nos. 93 and 95.) Thus the 1956 assets purchase did not mark the onset of KMC assuming KFC's former production niche.

It is irrelevant that KMC and KFC may have continued to share directors and managers after the asset purchase, or that their operations were functionally integrated. As discussed above in the context of *alter-ego* liability, the relationship between the corporations was governed by joint operating agreements. Cost accounting methodologies were developed and monitored by creditors and an independent accounting firm.

As discussed above, the assets purchase was part of a broader reorganization in which entities formerly held by HJKCO, the Kaiser family's closely held corporation, became a subsidiary of KFC. The IRS issued to KFC an opinion letter stating that the exchange of HJKCO and KFC stock would be a tax-free reorganization under § 368 of the Internal Revenue Code. Defendants argue that because the assets sale to KMC was part of this tax-free reorganization, it was not a mere sale and therefore should be deemed a *de facto* merger. In light of the continued maintenance of KMC and KFC as separate entities after the reorganization (KMC as Willys Motors, KFC as Kaiser Industries), this argument carries no weight. Neither is the fact that KMC paid for KFC's assets with stock sufficient, standing alone, to create *de facto* merger.

Finally, defendants argue that KFC survived after the assets sale only because KMC and HJKCO needed to make use of KFC's losses to offset their own income for tax purposes, and IRS rules demanded the continued existence of KFC in order to do this. Whether or not this was the sole reason for

---

**11.** Defendants acknowledged at trial that under Michigan law all four factors must be present. However, following their argument that the law of the state of incorporation should control, defendants put forward cases from Pennsylvania, Delaware, New York, Maryland, and Massachusetts which they assert hold that de-facto merger is an equitable doctrine and the absence of any one factor is not determinative. As noted above, if any state ·of incorporation had a claim to govern this case it would be Pennsylvania. That state employs factors substantively identical to Michigan law, but Pennsylvania courts have indicated that not all factors need be present to find a merger. *Commonwealth v. Lavelle,* 382 Pa.Super. 356, 375, 555 A.2d 218, 227–28 (1989), *appeal denied,* 524 Pa. 595, 568 A.2d 1246 (1989). The difference is not determinative in this case, since I find that there was neither continuity of enterprise nor cessation of ordinary business by the seller, two factors which are key to *de facto* merger under any balancing test.

**1112**

KFC's survival is irrelevant, however, since KFC did indeed survive, with substantial assets, as Kaiser Industries.

### V. *Conclusion*

For the reasons stated above, I conclude that Chrysler is not the successor in interest of the Kaiser–Frazer Corporation. Therefore Chrysler is not liable for remediation costs at the Willow Run site attributable to KFC under CERCLA or MERA, nor for any claims of public nuisance or unjust enrichment.

IT IS SO ORDERED.